UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIE D. SANDERS,

                Petitioner,                      Case Number 2:08-CV-14448
                                                          Honorable Lawrence P. Zatkoff

v.

CINDI S. CURTIN, Warden,

                Respondent.

_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS AND GRANTING A CERTIFICATE OF APPEALABILITY

This matter is before the Court on Petitioner Willie D. Sander's petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254. Petitioner is currently serving a life sentence at the Oaks Correctional Facility in Manistee, Michigan.[1] His petition challenges his conviction for first-degree murder. MICH. COMP. LAWS 750.316. For the reasons that follow, the Court denies the petition.

### I. Facts and Procedural History

The instant case involves the January 8, 1997 shooting death of Clarence McFerrin in Kalamazoo, Michigan. McFerrin was shot while sitting in the driver's seat of his car. His two passengers and several bystanders witnessed the shooting. Four of these individuals identified Petitioner as the shooter at his bench trial. Petitioner's defense was mistaken identification. He claimed that Michael Lemon was the shooter and that the eyewitnesses were either mistaken or

---

[1] When petitioner filed his petition for a writ of habeas corpus he was incarcerated at the Saginaw Correctional Facility, but he has since been transferred to the Oaks Correctional Facility. The only proper respondent in a habeas case is the warden of the facility where the petitioner is incarcerated. *See Edwards Johns*, 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *See also* Rule 2(a), 28 U.S.C. § 2254. Therefore, the Court substitutes Warden Cindi S. Curtin in the caption.

lying.  The trial court chose to believe the eyewitnesses' testimony and found Petitioner guilty of first-degree murder and related firearm offenses.  Petitioner unsuccessfully pursued two rounds of state appellate proceedings before filing the present petition.

## A. Trial

At Petitioner's trial, police witnesses testified that there were two seemingly related shootings in Kalamazoo on January 8, 1997.  At around 10:00 p.m., Edward  Patterson was shot by James "Little Wolf" Camble.  Clarence McFerrin was shot and killed about an hour after the first shooting.  The shootings were believed to be related to a dispute between two groups of young men.  The "Kalamazoo Group" consisted of Clarence McFerrin, Jeffery Fry, Troy Elliot, Edward Patterson, and Darlynzo  Brown.  The "Chicago Group" consisted of Petitioner, James Camble, Ronald Wymes, Antoinne Riley, and Michael Lemon.

Darlynzo Brown testified that his group was having trouble with the other group.  On the night of the shootings, McFerrin was driving with Brown and Elliot.  Brown testified that he was sitting in the front passenger seat, and Elliot was sitting in the back.  McFerrin parked the car on Woodbury Street.  Brown exited the car and ran into his house to get his jacket.  In the house Brown learned that Patterson had been shot.  As he passed his aunt, Thelma Fry, on the way back out, he saw Petitioner walking towards him from down the street.  Petitioner approached and asked whether Brown had drugs.  Brown said "no" and climbed back into McFerrin's car.  Petitioner followed, approached the driver's window, and asked again about drugs.  Petitioner produced a handgun and fired shots into the car.  McFerrin was hit multiple times and died.  Brown saw Camble standing nearby the scene.  Brown testified that when he was interviewed by the police, he purposely identified someone other than Petitioner as the shooter in a photo lineup because he wanted to seek

revenge.

Troy Elliot testified to a similar account of the shooting. He testified that he was sitting in the back seat of McFerrin's car when he saw Petitioner open fire through the driver's window. He likewise testified that he purposely identified someone other than Petitioner as the shooter so that he could seek revenge against Petitioner. When the police confiscated his gun, however, Elliot relented and admitted to police that Petitioner was the perpetrator of the shooting.

Jeffery Fry testified that on the night of the McFerrin shooting, he saw Petitioner sitting by a fence before the shooting, and then he saw Petitioner in the area after the shooting. Fry was inside the house at the time of the actual shooting. Fry testified that he told the police that Petitioner was not the shooter and identified another man because he was intent upon killing Petitioner himself.

Thelma Fry, Brown and Jeffery's aunt, testified that she saw the McFerrin shooting from her porch. She identified Petitioner as the shooter, and she saw another stocky man standing nearby who might also have fired shots. She testified that she identified Petitioner and one other man as resembling the shooter at a photo lineup. She identified Petitioner as the shooter at the preliminary examination, and then at trial she testified that she was one-hundred percent sure of her identification.

Monique Camble testified that Petitioner stayed the night at her house on the date of the McFerrin shooting. She identified multiple individuals from the "Chicago Group" as coming and going on the night in question. Petitioner came and went as well, but he never left with James Camble, Antoinne Riley, and Michael Lemon.

Police officers testified that Petitioner was pulled over a few days later in a light blue car identified as being associated with a prior shooting. Petitioner gave a false name. The police

-3-

brought Petitioner to Monique Camble's house and she identified him.

Detective Steven Ouding testified that photo lineups were conducted for Camble and Lemon as well as Petitioner.  Camble was identified as the perpetrator of the earlier shooting.  Because Lemon was associated with Camble and he fit the general description of the perpetrator of the McFerrin shooting, his picture was also included in a lineup.  No one identified Lemon as the perpetrator, although Brown indicated that Lemon resembled the shooter.  The police intended to conduct a live lineup with Petitioner, but the officer testified that it was not held because Petitioner refused to cooperate.

Detective Greggory Hatter testified that Petitioner made two statements to police.  In his first statement, he denied that he was at Monique Camble's house on the night of the shooting.  In his second statement, he claimed that he was at Monique Camble's house and that Lemon came over with Riley and James Camble.  Petitioner claimed that Lemon bragged about the shooting and displayed the revolver he used.

Hatter also testified that he continued to get anonymous calls regarding the murder during the trial and that he attempted to follow-up on any new leads he received.  On cross examination, Hatter indicated that his interviews with Nina Witlow and a Ms. Holman pointed him towards Lemon as the perpetrator.

Rosco Manns, Monique Camble's boyfriend, was called as a witness for the defense.  He testified that he was with Petitioner at Camble's house on the night of the McFerrin shooting.  Manns testified that Lemon came over to the house with Riley and James Camble, and that Lemon stated that he had just shot someone.  Manns described how Lemon wrapped a gun in a cloth and said he was going to bury it.  Manns testified that Lemon was his cousin but he was not related to Petitioner.

-4-

On cross-examination Manns denied that he told police that Petitioner was with Riley, Camble, and Lemon when they came over.

Lee Logan also testified for the defense.  He testified that he was an eyewitness to the shooting and that Petitioner was not the shooter.  He stated that he was on a porch a few houses away from the location of the shooting.

Tamica Cohen testified that she was the mother of one of the victim's children.  She testified that she did not see the shooting itself, but she saw James Camble and another short man run through a cut-through from the street where the shooting occurred towards "Noonie and Tara's" house. There, the two men got into a little red car and drove away.  Petitioner was not the man running with Camble.  The prosecutor called police witnesses to impeach Logan and Cohen's testimony as being different from the statements they made to police.

The trial court, acting as trier of fact, found Petitioner guilty as charged.  Petitioner was subsequently sentenced to mandatory life imprisonment for the murder conviction and lesser terms for the firearm offenses.  The sentences for the firearm offenses have been fully served.

### B. Motion for New Trial

Petitioner's trial counsel filed a motion for new trial, arguing that the conviction was against the great weight of the evidence and that newly discovered evidence undermined the case against Petitioner.  Several hearings were held on the motion.

James Camble testified that he had falsely told police that he was not present at the scene of the murder.  He contacted Petitioner's defense counsel after the trial was over.  Camble testified that he was standing about fifty feet away from the location of the shooting and that he saw the back of the man who shot McFerrin.  Camble testified that he knew Petitioner his whole life, and that

Petitioner was not the man who shot McFerrin.  Camble repeatedly invoked his Fifth Amendment rights while testifying in response to various questions, and he would not identify who was responsible for the shooting.

Petitioner also offered polygraph test results indicating that he was being truthful when he denied that he participated in the murder.  Polygraph examiner Sharon Whaley testified that she examined Petitioner prior to trial, and that he was telling the truth about not being the shooter.  Leonard West, another polygraph examiner, also testified that Petitioner was telling the truth.  West also examined Camble and determined that he was telling the truth about what Petitioner told him.  A third examiner, Lyn Marcy, also believed Petitioner and Camble.

Polygraph examiner Leonard Harrelson testified that he had written books about polygraph examination and had taught Whaley and Marcy.  He examined Petitioner prior to trial after Whaley had done so.  Harrelson concluded that Petitioner was being deceptive.

Prior to trial, defense counsel requested to have Harrelson's charts examined by Whaley.  At the suggestion of the trial prosecutor, Harrelson sent the original charts to the Kalamzoo police without making copies.  They were thereafter lost and never examined by anyone from the defense.

The trial court denied the motion for new trial.  The court characterized Camble's testimony as highly suspect and "inherently unreliable," because Camble lied to police during the investigation and because of his close relationship with Petitioner.

### C. Direct Appeal

Petitioner's appellate counsel then filed a brief in the Michigan Court of Appeals raising two claims:

> I. The lower court committed reversible error when it denied [Petitioner's] motion for new trial based on newly discovered evidence.

II.  The lower court committed reversible error when it denied [Petitioner's] motion for a new trial on the fact that the verdict was against the great weight of the evidence.

The Michigan Court of Appeals affirmed the decision of the trial court in an unpublished opinion. *People v. Sanders*, No. 207546 (Mich. Ct. App. November 30, 2001).  Petitioner then filed an application for leave to appeal in the Michigan Supreme Court raising the same two claims.  The Michigan Supreme Court denied leave to appeal. *People v. Sanders*, 467 Mich. 854; 650 N.W.2d 338 (2002).

### D. Motion for Relief From Judgment

Petitioner, represented by his current counsel, then filed a motion for relief from judgment in the trial court.  The motion raised six claims:

I. Petitioner Sanders was denied his right to a fair trial under the due process clause of the United States Constitution where the prosecutor failed to timely disclose critical *Brady* material; Alternatively, due process was denied under the Federal Constitution where the failure to timely provide the defense with key information in a police report resulted in the bad faith destruction of potentially exculpatory evidence.

II.  Petitioner Sanders was denied the effective assistance of counsel guaranteed by the Federal Constitution where his trial attorney, with no strategic purpose, made several outcome-determinative errors.

III.  In court confrontation procedures were unnecessarily suggestive and should have been avoided as they gave rise to a substantial likelihood of irreparable misidentification, denying Petitioner due process of law.

IV.  Petitioner was denied the effective assistance of counsel guaranteed by the Federal Constitution where his state appellate counsel, on direct appeal, neglected "dead bang winners" and failed to properly develop the two issues that were presented on appeal.

V. The trial court abused its discretion in failing to appropriately consider polygraph results supporting Petitioner's new trial request under People v. Barbara, denying Petitioner his Federal due process rights.

VI.  Petitioner was denied his due process right to a fair trial under the Federal Constitution when the prosecutor engaged in severe outcome-determinative misconduct.

Petitioner based his first claim on his counsel's discovery of a six-page police report prepared by Detective Hatter and dated September 9, 1997.  Petitioner's current counsel states that he discovered the report when he examined the prosecutor's file in July of 2003.  Petitioner's current counsel states that the report was not included in the materials sent to him by Petitioner, which Petitioner obtained from his appellate counsel by way of his trial counsel.

The September 9, 1997 report contains what Petitioner characterizes as information that likely would have led to the discovery of exculpatory evidence that was not presented at trial.  The report describes Detective Hatter's conversations with an anonymous caller occurring during the midst of trial.  The anonymous caller claimed that Monique Camble knew who the real perpetrator was, and she knew that her brother was involved because she heard him plan the murder with others in her basement.  The caller stated that James Camble, Riley, and Lemon test fired the gun in Monique's yard prior to the murder.  The caller stated that Lemon was the shooter and that Petitioner was not present.

The caller also told Hatter that "Noonie" told her that Riley, Camble, and Lemon ran to her house after the shooting, and that Noonie told Tericita Sanders - the victim's wife -  that Petitioner was the shooter to cover-up for Riley, Camble, and Lemon.  The caller claimed that Noonie also told Sheila Mitchell that Riley, Lemon and Camble shot McFerrin.  The caller stated that Tericita Sanders paid witnesses to identify Petitioner as the shooter.  The caller also told Hatter that Vanita Stegal, Lemon's girlfriend, and Tera, Riley's girlfriend, knew the whole story.

The report describes Detective Hatter's attempts to follow-up on this information.  He

informed the trial prosecutor of the anonymous call, and she replied that she had also spoken with

the caller.  Hatter contacted Stegal, who said that she was with Lemon on the night of the shooting

but that he never admitted to her that he was involved.  Hatter was able to locate Tera's mother, but

he could not locate Tera.  Hatter was able to identify "Noonie" as Qualisqua Franklin, but she could

not be located.  Hatter also interviewed the victim's wife, and she denied that she had paid anyone

to identify Petitioner as the shooter.  Hatter was never able to identify the anonymous caller.

Multiple hearings were held in the trial court on Petitioner's motion for relief from judgment.

The evidence presented at these hearings focused on whether the September 9, 1997 report was

withheld from Petitioner.  Detective Hatter testified that he tried to identify the anonymous caller

but was unable to do so.  He also attempted to confirm the information the caller gave him, but he

found that it was unreliable and contradicted by other witnesses.  Hatter testified that the report

referred to people who were already identified in other police reports.

The trial prosecutor testified that she forwarded all police reports to Petitioner's trial attorney

in person, by mail, or by fax.  She explained that whenever copies of reports were made for defense

counsel, she would place a uniquely colored piece of paper in the file indicating what had been sent.

The prosecutor's file contained such a colored sheet indicating that all reports through September

12, 1997 had been copied and given to defense counsel.

The trial prosecutor recalled the September 9, 1997 report, and she recalled speaking with

defense counsel about the anonymous caller before she gave him the report.  She recalled asking

defense counsel whether he would request an adjournment, but defense counsel replied that he had

a witness who would testify to the matters contained in the report.

Petitioner's appointed appellate counsel testified that Petitioner's trial counsel sent him

-9-

Petitioner's file. He, in turn, sent everything he received to Petitioner after the direct appeal was completed. Appellate counsel testified that he probably did not see the September 9, 1997 report in the file.

Petitioner's trial counsel testified that he never received the report, nor could he remember talking about it with the trial prosecutor. He testified that he gave his entire file to appellate counsel. Trial counsel testified that if he had been given the report, he would have requested an adjournment and would have investigated the matters contained in it.

The prosecution also sought to establish that the report was given to defense counsel by use of a computer screen print-out of a "diary" that purported to show that a copy of the report was given to defense counsel. Petitioner's current counsel sought to have the computer file examined by an expert to determine the date on which the entry was made, the suggestion being that the trial prosecutor recently fabricated the entry. The appellate prosecutor objected to the inspection on the grounds that the computer records were stored on the county's system and not the prosecutor's hard-drive, raising security and confidentiality concerns, and that software changes and file conversions since the time of trial complicated the analysis. The trial court denied Petitioner's request for the inspection, and also ruled that it would not consider the diary entry as proof that the report was disclosed at trial.

The court issued an order denying the motion for relief from judgment. The court found that there was no evidence that the prosecutor suppressed the report. It found that defense counsel knew about the report, and that the prosecutor's file indicated that it was in fact copied for defense counsel. The trial court also found that nothing in the report was new or startling, and therefore Petitioner was not prejudiced. The trial court also rejected Petitioner's suggestive identification claim and

-10-

prosecutorial misconduct claims on the merits.

Petitioner appealed this decision to the Michigan Court of Appeals. The court denied Petitioner's application for leave to appeal, "for failure to meet the burden of establishing entitlement to relief under Mich. Ct. R. 6.508(D)." *People v. Sanders*, No. 279141 (Mich. Ct. App. January 11, 2008). The Michigan Supreme Court subsequently denied Petitioner leave to appeal under the same court rule. *People v. Sanders*, No. 135948 (Mich. Sup. Ct. September 17, 2008).

Petitioner then filed the instant petition, asserting six claims:

I. Petitioner Sanders was denied his right to a fair trial under the due process clause of the United States Constitution where the prosecutor failed to timely disclose critical *Brady* material; alternatively, due process was denied under the federal constitution where the failure to timely provide the defense with key information in a police report resulted in the bad faith destruction of potentially exculpatory evidence.

II. Petitioner Sanders was denied the effective assistance of counsel guaranteed by the federal constitution where his trial attorney, with no strategic purpose, made several outcome-determinative errors.

III. In court identification procedures were unnecessarily suggestive and should have been avoided as they gave rise to the substantial likelihood of irreparable misidentification, denying Petitioner due process of law.

IV. Petitioner was denied the effective assistance of counsel guaranteed by the federal constitution where his appellate counsel, on direct appeal, neglected "dead bang winners" and failed to properly develop the two issues that were presented on appeal.

V. Petitioner was denied his due process right to a fair trial under the federal constitution when the prosecutor engaged in severe outcome-determinative misconduct.

VI. Assuming arguendo that the standard of review set forth in 28 U.S.C. § 2254(d)(1) precludes relief in this action, the court should not apply that standard because it is unconstitutional, and the court should grant the writ under a de novo standard of review.

### III. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010) (*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997)); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). "[A]

-12-

state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, No. 2011 WL 148587, * 11 (U.S. 2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. 770.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id*. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id*. (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 131 S.Ct. at 786-787.

## IV. Analysis

### A. Suppression and Destruction of Exculpatory Evidence

Petitioner's first habeas claim asserts that the prosecution suppressed the September 9, 1997 police report at trial.   Petitioner asserts that the delay in handing over the report amounts to the destruction of exculpatory evidence because by the time the report was given to defense counsel during state post-conviction review proceedings, it was no longer possible to follow-up on any leads and develop them into exculpatory evidence. Petitioner argues that the state trial court's adjudication of the claim involved an unreasonable determination of the facts, and he asks the Court to hold an evidentiary hearing to further develop a factual basis for the claim.  He also requests that the Court order that the computer diary entry made in the Saginaw County computer system, which purports to show when the police report was given to defense counsel, be examined by an expert to determine when it was made.  Respondent asserts that the state court reasonably adjudicated the claim and that Petitioner is not entitled to an evidentiary hearing.

This claim was first presented to the state courts in Petitioner's motion for relief from judgment.  The trial court rejected the claim on the merits, finding that the police report was handed over to the defense at trial and that even if it were not handed over, "its exculpatory value is debatable." Order Denying Motion for Relief from Judgment, at 11.  The Michigan appellate courts subsequently denied relief by use of the form order citing Michigan Court Rule 6.508(D).

The "[b]rief orders citing Michigan Court Rule 6.508(D) are not explained orders. . . ." *Guilmette v. Howes*, 624 F.3d 286, 289-90 (6th Cir. 2010) (en banc). Therefore, this Court must "look through" them to the decision of the state trial court to determine the basis for the denial of state post-conviction relief. *Id*. at 291.  The trial court's order rejected the claim on the merits.

-14-

Accordingly, under § 2254(d) as interpreted by *Harrington*, habeas relief is barred unless Petitioner can demonstrate that the trial court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 131 S.Ct. at 786-787.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court established that a prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "[I]t is well settled that this disclosure obligation includes evidence that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011-12 (6th Cir. 1999). "[T]here is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

The state trial court's adjudication of this claim was not unreasonable. First, the trial court found that the police report was not suppressed by the prosecution. This finding was reasonably supported by the evidence presented at the state evidentiary hearing. The trial prosecutor testified that she recalled discussing the material in the report with defense counsel. She testified regarding her practice of handing-over all discovery materials to defense counsel. A uniquely color-coded sheet located in the file indicated that the prosecutor had copied all reports for defense counsel

through September 12, 1997, which would include the report in question.  This testimony allowed the trial court to find that the report was, in fact, disclosed to Petitioner at trial.

Petitioner asserts that the prosecutor refused to allow the computerized diary to be examined, and that this suggests that the entry was recently fabricated.  But the trial court's decision to deny Petitioner's motion to have the file examined was reasonably based on matters not connected to an alleged cover-up.   The court was concerned that such an analysis might compromise the county's computer system, and it was not convinced that such an analysis could reliably be performed.  More importantly, the trial court stated that it did not consider the diary entry as evidence that the prosecutor disclosed the report at the time of trial.

Petitioner argues that defense counsel's aggressive approach at trial strongly suggests that he would have asked for an adjournment to investigate the matters contained in the report if he had truly received it.  The trial court's decision not to credit trial counsel's testimony that he did not receive the report was reasonable.  The trial prosecutor testified that defense counsel told her that he decided not to ask for an adjournment because the information contained in the report would be covered by his defense witnesses.  Defense counsel admitted during cross examination to not having a clear recollection of every report he received.  The trial court noted that defense counsel was seen at trial with a large number of documents piled on the defense table, but that when he forwarded his file to appellate counsel, it fit in a standard-sized envelope.  This evidence allowed for a reasonable inference that Petitioner's current counsel - who received the file from Petitioner by way of his appellate counsel - did not receive the complete file that trial counsel had at the time of trial.  Defense counsel's hindsight testimony that he would have asked for an adjournment had he received the report need not have been credited as true by the trial court.

-16-

Ultimately, the decision of the trial court to credit the testimony of the prosecutor over defense counsel amounted to an everyday factual finding made after a classic battle of word-against-word.  It is difficult to characterize such a finding as unreasonable, let alone one that "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington, supra.*

The trial court also found, in the alternative, that even if the report was not disclosed, Petitioner was not prejudiced.  This conclusion was also reasonable.  The individuals identified in the report were already well-known at the time of trial.  Not only was the allegation that Lemon was the shooter not new to the defense, it was the defense Petitioner presented at trial.  The information that Camble, Riley, and Lemon went to Camble's sister's house after the shooting was known by the defense.  During the cross-examination of Monique Camble, defense counsel specifically questioned her about whether Petitioner left and arrived at her house with James Camble, Riley, and Lemon or separately.  Defense counsel cross-examined the detectives regarding their investigation of Lemon as a suspect.  Defense counsel elicited from Detective Hatter that his interviews with Nina Witlow and Ms. Holman pointed towards Lemon as the perpetrator.

Defense counsel also presented Rosco Manns as a witness.  Manns testified that: (1) he was with Petitioner at Camble's house, (2) he saw Lemon arrive with Riley and James Camble, and (3) Lemon admitted that he committed a shooting on the street where the murder occurred.  Defense counsel also presented Tamica Cohen as a witness.  She testified that she saw two men run towards "Noonie and Tara's" house after the shooting, and that Petitioner was not one of the men.  These individuals are the same ones identified in the police report.  It is apparent that, even if defense counsel did not know about this specific report, the information and allegations contained in the

-17-

report were known to him, and he presented witnesses who testified to those facts at trial.

The only material allegation in the report not surfacing during the trial is the claim that the victim's wife paid the eyewitnesses to identify Petitioner as the shooter.  But the anonymous caller, even had she been identified, did not claim to have personal knowledge of this information.  It is not clear how defense counsel could have made use of this information beyond questioning the victim's wife about it on cross-examination.  And, based on Detective Hatter's follow-up investigation, there is little question that the victim's wife would have simply denied the allegation.  In any event, defense counsel thoroughly cross-examined the eyewitnesses on their identification of Petitioner as the shooter, and he suggested that they falsely identified Petitioner as the shooter.

Because the allegations and individuals named in the report were already known, and because Petitioner unsuccessfully presented a defense along the same lines, the trial court's rejection of the claim on the merits was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington, supra*.  That is, the trial court reasonably rejected both prongs of Petitioner's *Brady* claim.  He is therefore barred from obtaining habeas relief under § 2254(d)(1) on that basis.

Petitioner also asserts that the trial court's conclusions amounted to an unreasonable determination of the facts under § 2254(d)(2).  Petitioner points to factual errors in the recitation of the facts in the trial court's order denying the motion for relief from judgment.  Petitioner notes that the trial court mistakenly stated that eyewitnesses changed their identification of the perpetrator two weeks rather than two days after their first statements.  Petitioner also points to a statement by the trial court that evidence showed that an "extensive" police investigation into the information contained in the police report had been conducted.  Petitioner catalogues the things that Detective

-18-

Hatter could have done, but did not do, to extensively investigate the information.

These are minor, unconvincing points. Whether the witnesses changed their identification to Petitioner two days or two weeks after identifying another man, the changing stories undermined, to some extent, the reliability of their testimony - albeit not enough in the eyes of the trial court. In addition, the trial court's use of the adjective "extensive" to describe Detective Hatter's efforts to follow-up on the information given to him by the anonymous caller was not unreasonable. The call came during the trial, and Hatter attempted to contact the individuals named by the caller. The fact that Hatter did not do more does not mean his efforts cannot fairly be characterized as "extensive" under the circumstances. In any event, these two arguable factual errors did not figure in any meaningful way into the court's analysis and do not undermine the basis for its decision. That is, the adjudication of Petitioner's claim by the state trial court was not the result of an unreasonable determination of the facts.

Petitioner also argues that the late disclosure of the police report amounts to the bad-faith destruction of potentially exculpatory evidence by the prosecutor because the persons identified in the report are now either unavailable or lack sufficient memory. Petitioner points to the prosecutor's actions with respect to Harrelson's polygraph charts as evidencing her bad-faith on another occassion.

"Separate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, *see* [*California v. Trombetta*, 467 U.S. 479, 489 (1984)], versus cases where 'potentially useful' evidence is not accessible." *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) (*citing Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)).

-19-

A defendant's due process rights are violated where material exculpatory evidence is not preserved. *Trombetta*, 467 U.S. at 489.  For evidence to meet the standard of constitutional materiality, it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. at 488-89.  The destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith. *See id*. at 488; *Youngblood*, 488 U.S. at 57.

However, "the Due Process Clause requires a different result when [] deal[ing] with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57.  "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. A habeas petitioner has the burden of establishing that the police acted in bad faith in failing to preserve potentially exculpatory evidence. *See Malcum v. Burt*, 276 F.Supp.2d 664, 683 (E.D. Mich. 2003).

In this case, the information contained in the report falls into the category of 'potentially useful' evidence that is no longer accessible.  Accordingly, Petitioner is required to show that the prosecutor acted in bad-faith.  As noted by Petitioner, the trial court did not specifically adjudicate Petitioner's claim as a destruction-of-the-evidence claim.  But the trial court's finding that the report in question was, in fact, disclosed to defense counsel at trial necessarily undermines the factual basis for this aspect of his claim.  That is, if the report was not suppressed at all, the prosecutor obviously did not act in bad-faith in failing to preserve potentially exculpatory evidence.

-20-

Petitioner requests an evidentiary hearing to further develop the facts in support of his first claim, and he specifically asks that the prosecutor's computerized diary entry be examined by an expert. The request must be denied in light of recent Supreme Court authority. In *Cullen v. Pinholster*, [No. 09-1088,] 131 S. Ct.1388, 1398 (2011), the Supreme Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Where, as here, the Court has already determined that habeas relief is barred by § 2254(d) because the state trial court reasonably decided Petitioner's claim, no amount of new evidence in support of the underlying claim can impact the result. Accordingly, Petitioner request for an evidentiary hearing is denied.

### B. Ineffective Assistance of Trial Counsel

Petitioner's second claim asserts that he was deprived of his right to the effective assistance of counsel at trial for a number of reasons. Petitioner contends that assuming the September 9, 1997 police report was disclosed during the trial, defense counsel was ineffective for failing to make better use of it. Petitioner also asserts that his trial counsel failed to: (1) move to suppress the in-court identification testimony of Thelma Fry on the grounds that it was the product of an unduly suggestive identification procedure occurring at the preliminary examination, (2) argue to the jury the discrepancy between Petitioner's actual height and weight and the description of the shooter given by eyewitnesses to the police, (3) present evidence that he refused to take part in the corporeal line-up because of the police department's failure to provide individuals with adequately similar appearances. Finally, Petitioner asserts that he is entitled to an evidentiary hearing to develop these claims. Respondent claims that the state court adjudication of the claim was not unreasonable.

Petitioner's ineffective assistance of counsel claim was first presented to the state courts in

his motion for relief from judgment.  As is the case with Petitioner's first claim, the only explained decision is the one made by the trial court.  The trial court found that the claim was "effectively moot" because Petitioner had not demonstrated that he was prejudiced.  The Supreme Court addressed the application of § 2254(d) to such a summary denial of a claim.  In such circumstances, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Harrington*, 131 S. Ct. at 786.

To establish that he received ineffective assistance of counsel, a petitioner must show: (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689.  This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687.  To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  "[T]he focus should be on whether the result of the trial was 'fundamentally unfair or unreliable.'" *Tinsley v. Million*, 399 F.3d 796, 802 (6th Cir. 2005) (*quoting Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).  Moreover, in *Harrington*, the United States Supreme Court stated, "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S.Ct. at 788

-22-

(internal and end citations omitted).

Petitioner first asserts that his trial counsel was ineffective for failing to have investigated the information in the September 9, 1997 report. The record shows, however, that defense counsel presented a defense based on the information contained in the report. This record evidence could have supported the state court's decision summarily denying the claim on the merits. As stated above, the anonymous caller essentially claimed that Lemon was the shooter and identified people who had knowledge of that fact. Defense counsel did, in fact, present witnesses in support of this theory of defense. Monique Camble was questioned about whether Petitioner was with James Camble, Riley, and Lemon at her house on the night of the murder. Defense counsel cross-examined the detectives regarding their investigation of Lemon as a suspect. Defense counsel elicited from Detective Hatter that his interviews with Nina Witlow and Ms. Holman pointed towards Lemon as the perpetrator. Rosco Manns testified for the defense that he was at Monique Camble's house, heard Lemon admit to the shooting, observed Lemon show the gun he used, and watched Lemon wrap it in a cloth for burial.

Detective Hatter stated in the report that he attempted to contact the individuals named by the anonymous caller, and his follow-up investigation reveals that they were not available or would not support the caller's version of events. Petitioner has not and cannot show that his counsel could have faired any better with this information. From what the record shows, defense counsel was aware of the information and presented the defense theory at trial through cross-examination of the prosecution's witnesses and through the testimony of the witnesses he was able to produce for the defense. Moreover, for the reasons stated above, Petitioner has not shown a reasonable probability that the result of his trial would have been more favorable but for his counsel's failure to further

investigate the information contained in the report.

Next, Petitioner asserts that his counsel was ineffective for failing to challenge the in-court identification testimony of Thelma Fry.  For the reasons stated below in Section IV(C), counsel was not ineffective for failing to make an objection that lacked merit.  In any event, defense counsel's decision to challenge the identification testimony at the bench trial rather than in a pretrial motion, where the same fact-finder would hear the testimony, was a reasonable tactical decision.  *See*, *e.g.*, *Brown v. Lafler*, 2010 U.S. Dist. LEXIS 131926, 24-25 ( E.D. Mich. Dec. 14, 2010) ("The decision to attack the credibility of the victim's identification of Petitioner through the examination of witnesses at trial, rather than by filing a pre-trial motion to challenge the suggestiveness of the identification procedure, was a reasonable trial strategy.  This is true especially in view of the fact that the trial was to the bench, before a judge as fact-finder who would be exposed to the manner and means of the lineup whether it were presented in the form of a pre-trial motion or an in-trial exposition."); *Williams v. Smith*, 2009 U.S. Dist. LEXIS 124855 (W.D. Mich. Nov. 9, 2009)(internal citations omitted) ("Under the circumstances of this case, counsel's strategic choice to forgo a jury and press the issue of identity before the circuit judge at the bench trial fell 'within the range of logical choices an ordinarily competent attorney . . .  would assess as reasonable to achieve a specific goal.'")

Petitioner also asserts that defense counsel performed deficiently by failing to argue that the eyewitness identification of Petitioner as the shooter was unreliable based on variances between the physical description of the shooter given by those witnesses and Petitioner's actual appearance.  Petitioner cites one witness to the shooting who told Detective Ouding that the shooter was about 5'10" to 6' tall and weighed about 170 lbs.  Petitioner does not state how the eyewitnesses presented

at trial could be persuasively challenged with this description made by a different witness.  At the time of the crime, Petitioner had an unremarkably average height of 5'8" and weight of 135 pounds. In any event, defense counsel did challenge the eyewitnesses on their description of the shooter. Darlynnzo Brown was cross-examined at length regarding his description of the shooter to police. Troy Elliot was likewise challenged with his preliminary examination testimony, as were Jeffery and Thelma Fry.   Petitioner's claim that the cross-examination of the eyewitnesses was inadequate because it did not include a reference to one particular description ignores the "wide range of professionally competent assistance" recognized by the *Strickland* standard.

Finally, Petitioner asserts that his counsel deficiently failed to present evidence rebutting the testimony that Petitioner refused to cooperate in the corporeal lineup identification procedure.  But, better than present evidence to rebut the suggestion that Petitioner refused to cooperate, Petitioner's counsel successfully objected to the characterization altogether.  The trial court ruled that it would not "impugn to him any negative connotation" regarding Petitioner's failure to participate in the lineup.  Accordingly, Petitioner cannot demonstrate a reasonable probability that the result of his trial would have been more favorable had his attorney presented the testimony of the lineup attorney that it was his decision to cancel the lineup.

On this record, Petitioner has not overcome the presumption that defense counsel's performance fell within the wide range of professionally competent assistance or that he was prejudiced by his counsel's actions or inactions.  As such, there is no possibility that fairminded jurists would disagree with the result reached by the state trial court in rejecting this claim.  Finally, under *Cullen, supra,* there would be no utility in holding a hearing on this claim, because relief can be barred in light of the existing record  under § 2254(d).

-25-

## C.  Suggestive Identification Procedures

Petitioner's third claim asserts that Thelma Fry's in-court identification of Petitioner at the preliminary examination amounted to an unnecessarily suggestive identification procedure and led to a substantial likelihood of irreparable misidentification at trial.  Petitioner requests an evidentiary hearing, at which he asserts Thelma Fry would testify that she misidentified Petitioner as the shooter. This claim was also first raised by Petitioner in his motion for relief from judgment and decided against him on the merits by the trial court.  Respondent asserts that the state court's adjudication of the claim was reasonable.

Pretrial-identification procedures violate due process where the procedures are "unnecessarily suggestive and conducive" such that they risk "irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 301-302 (1967).  In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court held that identifications obtained through suggestive means may still be admissible if they are reliable. *Neil*, 409 U.S. at 196-197.  In determining whether they are reliable, "the central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id*. at 199.

> [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation.

*Id*. at 199-200.  These factors are weighed against the "corrupting effect of the suggestive identification itself." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Of the four eyewitnesses who participated in the photo lineup, Thelma Fry was the only one who identified Petitioner along with another man as possibly being the shooter.  Accordingly,

-26-

contrary to Petitioner's suggestion, the preliminary examination was not the first occassion in which Fry identified Petitioner. Petitioner does not suggest that the photo lineup was unfairly suggestive.

Nevertheless, application of the *Manson* factors reasonably support the rejection of the claim by the state trial court. First, Fry had an adequate opportunity to observe the perpetrator at the time of the crime. Fry described in some detail the events immediately prior to the shooting. She saw McFerrin's car arrive, her nephew Brown exit the car, and the perpetrator walk down the street and past her porch. According to her examination testimony, Fry was about twenty feet away from the perpetrator at one point, and there was a street light in the area. She heard a brief conversation between Brown and the perpetrator before he approached the victim's car.

Second, although Fry testified that there were other people around, her description of the events contained enough detail to show that she was paying attention to the shooter. Her nephew, Brown, was one of the men in McFerrin's car. Brown exited the car, brushed by Fry on the porch and stopped to have a very brief conversation with the perpetrator in front of the house. Fry's testimony regarding this event shows that she was paying attention to her nephew and his brief interaction with the perpetrator. Her attention remained focused on Brown and the shooter, as she was able to describe what happened after the brief conversation in front of her house.

Third, Fry's description of the shooter was not inconsistent with Petitioner's actual appearance. She testified that he was the approximate height and build as Brown, and she described the differences in his facial hair on the night of the shooting and during the preliminary examination. Contrary to Petitioner's assertion, Fry testified at the preliminary examination that she saw the perpetrator's face, and she was able to describe his general facial features.

Fourth, Fry did not indicate that she was certain as to her identification at the lineup or at the

-27-

preliminary examination.  Fry admitted during the preliminary examination that she was not sure she would recognize the shooter, and she picked Petitioner and one other man as possible subjects at the photo lineup.  At trial, on the other hand, Fry testified that she was one-hundred percent sure of her identification.  While the other factors weigh in favor of the state, this factor favors Petitioner.

Finally, there was some lapse of time, but not a substantial one, between the crime and the identification procedures.  The lineup occurred within days of the crime, and the preliminary examination occurred about two months after the crime.  *Compare Holland v. Wolfenbarger*, 2010 U.S. Dist. LEXIS 129461, 24-25 (E.D. Mich. Dec. 8, 2010) (delay of a few weeks not substantial);*Chandler v. Sherry*, 2010 U.S. Dist. LEXIS 121611 ( E.D. Mich. Nov. 17, 2010) (two week delay between crime and lineup not substantial).

In sum, four of the five relevant factors may reasonably be viewed to weigh in favor of the state.  The question here is not whether Fry's identification of Petitioner at trial was the result of an impermissibly suggestive identification procedure.  The question is whether the trial court reasonably determined that Petitioner's due process rights were not violated by Fry's contradictory testimony.  Under *Harrington*, habeas relief is barred under § 2254(d) because there is no possibility that fairminded jurists would disagree with the trial court's summary adjudication of the claim.

### D.  Ineffective Assistance of Appellate Counsel

Petitioner's fourth claim asserts that he was denied the effective assistance of appellate counsel during his appeal of right.  Petitioner argues that his appellate counsel performed deficiently by failing to raise the issues raised in this petition. He also asserts that appellate counsel deficiently presented the two claims that were raised on direct appeal.  The trial court addressed and rejected this claim on the merits when it denied Petitioner's motion for relief from judgment.  Respondent

-28-

asserts that the state court adjudication of the claim was reasonable.

In order to establish ineffective assistance of appellate counsel, Petitioner must show "that counsel's performance was deficient . . . [and] that the deficient performance prejudiced the defense." *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). The Supreme Court explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the . . . goal of vigorous and effective advocacy . . . . Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* at 754.

Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail." *See Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Barnes*, 463 U.S. at 751-52)). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of appellate counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002). Appellate counsel may deliver deficient performance and prejudice a defendant by omitting a "dead-bang winner," defined as an issue which was obvious from the trial record and would have resulted in reversal on appeal. *See Meade v. Lavigne*, 265 F. Supp. 2d 849, 870 (E.D. Mich. 2003).

Petitioner first asserts that his appellate counsel was ineffective for failing to raise on direct appeal the issues that were raised in his motion for relief from judgment. These issues are not

clearly stronger than the claims presented by appellate counsel. For the reasons discussed above, the claims relating to the September 9, 1997 police report are not clearly stronger. The trial court's finding that the report was, in fact, disclosed to defense counsel at trial undermines that factual basis for the claim. There is no reason to suppose that a different factual finding would have been made if the hearing had been held as part of the direct appeal instead of the post-conviction proceeding.

Likewise, Petitioner has not demonstrated that his ineffective assistance of trial counsel claim would have faired any better than it did had it been raised on direct appeal. The record shows that defense counsel adequately presented Petitioner's misidentification defense and asserted that another person was responsible for the shooting. For the reasons stated above, the suggestive-identification-procedure claim also is not clearly stronger than the claims raised on direct appeal. Finally, as discussed below, Petitioner's prosecutorial misconduct claim was rejected on the merits by the trial court. The trial court specifically found that it would not consider the testimony that Petitioner refused to participate in the lineup against him. This ruling undermined the claim, and as a result, appellate counsel had no obligation to raise it.

Petitioner also asserts that appellate counsel inadequately presented the two issues that he did raise during the direct appeal. Petitioner claims that his appellate counsel failed to adequately brief his great-weight-of-the-evidence claim and failed to "federalize" it. He also claims that his counsel failed to adequately present his newly-discovered-evidence claim, however, the trial court addressed and denied these claims on the merits when it denied Petitioner's motion for a new trial. The Michigan Court of Appeals affirmed this result in its opinion upholding Petitioner's convictions, and there is no indication in either opinion that the claims were denied due to appellate counsel's failure to adequately present them. The state court essentially denied the newly-discovered-evidence

claim on the ground that James Camble's testimony was not newly discovered. Petitioner does not demonstrate how a different presentation of the claim would have undermined this basis for the decision. The same is true for Petitioner's great-weight-of-the-evidence claim. The Michigan Court of Appeals denied that claim by referring to the strength of the case presented against Petitioner at trial. No manner of appellate advocacy would have changed the record evidence relied upon by the state court to deny the claim.

Accordingly, Petitioner has not demonstrated that the trial court's rejection of his ineffective-assistance-of-appellate-counsel claim was unreasonable. Habeas relief on this claim is therefore barred by § 2254(d)(1).

### E. Prosecutorial Misconduct

Petitioner's fifth claim asserts that the prosecutor committed misconduct by unfairly accusing Petitioner of refusing to participate in the corporeal lineup. The trial court denied this claim on the merits as well. Respondent asserts that Petitioner is not entitled to habeas relief because the state court decision was reasonable.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the [fact-finder] or prejudice the petitioner, whether it was isolated or extensive, and

-31-

whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court. *See id*. at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

Here, the prosecutor asserted that Petitioner refused to participate in the lineup. This argument was based on the testimony of the police officers who had attempted to conduct the identification procedure. Defense counsel interjected an objection stating that it was an attorney who advised Petitioner not to participate because of the composition of the lineup. The prosecutor responded that the evidence was being offered to show why the police conducted a photographic lineup instead of a corporeal lineup. The trial court stated that it would allow the testimony for that limited purpose and would not "impugn to [Petitioner] any negative connotations." In its findings of fact following the trial, the trial court did not refer to Petitioner's refusal to participate in the lineup as evidence of a guilty conscious. On this record, therefore, Petitioner has not shown that the evidence was improper or that it unfairly prejudiced Petitioner. The trial court's decision was therefore not unreasonable, and Petitioner is not entitled to relief with respect to this claim under § 2254(d).

### F.  Constitutionality of 28 U.S.C. 2254(d)(1)

Finally, Petitioner contends that the standard of review set forth under 28 U.S.C. § 2254(d)(1) is unconstitutional for five reasons: (1) the limitations under 28 U.S.C. § 2254(d)(1) violate the doctrine of separation of powers; (2) the limitations under 28 U.S.C. § 2254(d)(1) violate the Supremacy Clause of the United States Constitution; (3) the unconstitutionality of 28 U.S.C. §

2254(d)(1) requires the federal court to issue advisory opinions that may not be enforced; (4) the standard of review under 28 U.S.C. § 2254(d)(1) violates the Due Process Clause of the Fourteenth Amendment; and (5) the strictures of the AEDPA violate Article I, Section 9 of the federal constitution because they effectively suspend the writ of habeas corpus.

First, Petitioner asserts that 28 U.S.C. § 2254(d)(1) violates the separation of powers by mandating the law to be applied by federal courts and removing their power to adjudicate constitutional issues. The Fourth and Ninth Circuits both have rejected this argument:

> In amending section 2254(d)(1), Congress has simply adopted a choice of law rule that prospectively governs classes of habeas cases; it has not subjected final judgments to revision, nor has it dictated the judiciary's interpretation of governing law and mandated a particular result in any pending case. And amended section 2254(d) does not limit any inferior federal court's independent interpretive authority to determine the meaning of federal law in any Article III case or controversy. Under the AEDPA, we are free, if we choose, to decide whether a habeas petitioner's conviction and sentence violate any constitutional rights. Section 2254(d) only places an additional restriction upon the scope of the habeas remedy in certain circumstances.

*Green v. French*, 143 F.3d 865, 874-75 (4th Cir. 1998) (internal citations), *abrogated on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000).

> Section 2254(d) merely limits the source of clearly established law that the Article III court may consider, and that limitation served to govern prospectively classes of habeas cases rather than offend the court's authority to interpret the governing law and to determine the outcome in any pending case.

*Duhaime v. Ducharme*, 200 F.3d 597, 601 (9th Cir. 2000); *see also, Evans v. Thompson*, 518 F.3d 1, 4-10 (1st Cir. 2008). For these reasons, the Court likewise rejects the petitioner's claim that the AEDPA standard of review violates the separation of powers by encroaching on the Court's exercise of the judicial power.

Second, Petitioner maintains that the AEDPA standard violates the Supremacy Clause of the

-33-

United States Constitution.  The Court finds that this claim has no merit.

> Nothing in the AEDPA subjugates the Constitution to state law.  As the Supreme Court has often noted, the state courts, as co-equal guardians of federal constitutional rights, are perfectly capable of passing on federal constitutional questions.  And under the Supremacy Clause, state courts are obligated to enforce the Constitution above state law to the contrary.  Nothing in the AEDPA changes this rule of law.  The AEDPA does, to be sure, require that federal courts give deference to the federal constitutional decisions of the state courts.  This, however, does not offend the Supremacy Clause, which "is concerned with promoting the supremacy of federal law, not federal courts."  In short, the AEDPA standard of review does not violate the Supremacy Clause because that Clause "is concerned about a conflict between state and federal law, not between state and federal judges.  Indeed, to say, as the Clause does, that federal law shall be 'Supreme . . . anything in the Constitution or laws of any State to the Contrary notwithstanding' is to say nothing at all about the respective roles of the state and federal courts."

*Byrd v. Trombley*, 580 F. Supp. 2d 542, 552 (E.D. Mich. 2008) (internal citations omitted).

Therefore, the Court does not find 28 U.S.C. § 2254(d)(1) to be violative of the Supremacy Clause.

Third, Petitioner claims that 28 U.S.C. § 2254(d)(1) violates Article III of the Constitution by requiring federal courts to issue advisory opinions.

> [N]othing in the AEDPA requires a federal court to determine whether a state court wrongly, as opposed to unreasonably, applied the Constitution. A federal court may, and the courts often do, dispose of a habeas case merely by assessing the reasonableness of the state determination, without ever rendering an opinion on the ultimate correctness of the state court decision.
>
> In any event, any determination on the merits of the underlying constitutional claim as part of the reasonableness inquiry under § 2254(d)(1) does not amount to an advisory opinion. The underlying constitutionality may decide the case, for if the particular claim is without merit as a matter of federal constitutional law, it necessarily follows that the state court's rejection of the claim was reasonable. At worst, a court's determination on the underlying constitutional question would be dictum, but dictum is not itself an unconstitutional advisory opinion.

*Id*. at 552-53 (internal citations omitted).  Therefore, 28 U.S.C. § 2254(d)(1) is not violative of Article III as it relates to the issuance of advisory opinions.

Fourth, Petitioner contends that 28 U.S.C. § 2254(d)(1) violates the Due Process Clause of

the Fourteenth Amendment. Petitioner argues that the "standard of review in 28 U.S.C. § 2254(d)(1)

expressly prevents federal courts from remedying a whole class of due process violations (*i.e.*, those

in which a state court has wrongly, but unreasonably, applied constitutional guarantees to the state

defendants), and in so doing it runs afoul of the Due Process Clause."

> Contrary to petitioner's argument, under the AEDPA standard of review he "is not
> denied a forum for the vindication of his constitutional rights. The Court still has the
> power to issue the writ, albeit under more tightly circumscribed conditions." In
> particular, no due process violation can be shown in light of the historical power of
> Congress and the courts to impose limitations on the scope of habeas relief.

*Id*. at 553 (internal citations omitted). Consequently, Petitioner's due process rights have not been

violated.

Finally, Petitioner asserts that "the strictures set out in . . . AEDPA . . . violate Article I,

Section 9 of the federal constitution because they effectively suspend the writ of habeas corpus."

> The Supreme Court has "long recognized that 'the power to award the writ by any of
> the courts of the United States, must be given by written law,' and . . . that judgments
> about the proper scope of the writ are 'normally for Congress to make.'" *Felker v.
> Turpin*, 518 U.S. 651, 664 (1996).
>
> * * *
>
> The AEDPA does not suspend the writ as it was known at the time of the Founding,
> and "[a]ny suggestion that the Suspension Clause forbids every contraction of the
> powers bestowed by Congress in 1885, and expanded by the 1948 and 1966
> amendments to § 2254, is untenable . . ." [*Felker*, 518 U.S. at 664]. "Because federal
> courts are bound by the terms on which Congress sees fit to permit relief, we have
> no constitutional or other jurisprudential basis to be reluctant to accord state court
> decisions the full degree of deference that Congress intended and that the plain
> language of the statute requires." *Neal v. Puckett*, 286 F.3d 230, 248 (5th Cir. 2002).
> In light of the nature of the writ at common law, the historical power of Congress and
> the courts to alter the nature and scope of the writ, and the fact that § 2254(d)(1)
> merely alters the standards on which the writ will issue, every court that has
> considered the issue has rejected a Suspension Clause challenge to the AEDPA
> standard of review. *See Evans*, 518 F.3d at 12; *Olona v. Williams*, 13 Fed. App'x.
> 745, 747 (10th Cir. 2001); *Houston v. Roe*, 177 F.3d 901, 906 (9th Cir. 1999); *Green*,
> 143 F.3d at 875-76.

*Byrd*, 580 F.Supp.2d at 553-54. Therefore, there has been no Suspension Clause violation.

For these reasons, Petitioner's constitutional challenge to 28 U.S.C. § 2254(d)(1) is without merit.

## V. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id*. at 336-37.  The Court concludes that a certificate of appealability is warranted in this case.  The Court's analysis with respect Petitioner's first, second, third, and fourth claims is based, at least in part, on its interpretations of the Supreme Court's recent decisions in *Harrington* and *Cullen*.  Because reasonable jurists could debate the application of those cases to Petitioner's claims, a certificate of appealability is warranted.   Petitioner has failed to demonstrate entitlement to a certificate of appealability with respect to his fifth and sixth claims.

## VI. Conclusion

For the foregoing reasons, IT IS ORDERED that the petition for a writ of habeas corpus is DENIED and the matter is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that a certificate of appealability is GRANTED with respect to

Petitioner's first, second, third, and fourth claims.

IT IS SO ORDERED.

S/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  May 9, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on May 9, 2011.

S/Marie E. Verlinde
Case Manager
(810) 984-3290
